Our fourth case for this morning is Saxon v. Lashbrook, Mr. Miller Good morning, your honors. May it please the court. The principal question in this appeal is whether any rational trier of fact could have found Todd Saxon guilty beyond a reasonable doubt of murder, arson, or concealment of a homicide on the evidence induced at trial. And the answer is no, because at bottom, Mr. Saxon was convicted on the basis of his admitted one-time act of sex with the minor victim. But, you know, although you did get a very thoughtful dissenting opinion in the Illinois courts, it was a dissent. It wasn't, you know, a majority opinion. And what the state courts did was that they put this together on the basis of, this is not unusual, a number of threads of circumstantial evidence. Certainly the sexual contact was part of it, but forensic evidence on how recent it had to have been and how it correlated with other biological evidence and the possibility of access to the victim are all factors in this case. So it's awfully hard anyway to win on insufficiency of evidence claim, but we have to ask whether the state courts unreasonably themselves decided that the evidence was maybe not overwhelming, but enough. Yes, Your Honor. And it's our view that the Illinois appellate court did unreasonably apply the Jackson v. Virginia standard in this case. Can you think of any, what other 2254 cases have found that Jackson v. Virginia was unreasonably applied? I bet they're hard to find. They are hard to find. And unfortunately, Your Honor, none of those were cited in our report. I mean, I'm not sure they're out there, but maybe they are. I don't want to overstate the case, but they're hard to find. Yes, Your Honor. And I'd be happy to supplement the court with anything additional that I am able to find. Well, if you see something, but you don't have anything, we'll find it. But, you know, you've got him at the house probably around midnight. There's this fight that's going on outside. People have checked on O.W. over the course of the evening, so we know that she's still at the house as of the last check, which was when, 1130 or so, sometime like that. We have the evidence of the sexual contact, and I realize that his argument is that it was before that day, but I thought there was evidence that a jury could have credited that there would have been degeneration of the sperm had it been much earlier than that day, because it's three days later that we find the body. That's right, Your Honor, and that's the state's expert testimony. Yes, the sperm doesn't last forever. That's right. But two things about the state's expert's testimony, it's Mr. Gandor. He did testify that it is possible to obtain a sample of both DNA and sperm outside of that 72-hour window, so it's possible that that sample could have been obtained outside that window, first of all. Secondly, and relatedly... He didn't indicate that was likely, though, did he? He said it was more likely within the 72-hour window. All right, so if a jury had credited that it was more likely that it was within 72 hours, and you have the food evidence also to suggest the approximate time of death, that's not a... Again, it's a piece of evidence that would have pointed to him. Sure, and just one thing about Mr. Gandor's testimony as well is it's important to understand why it's more likely within that 72 hours that they would be able to obtain a sample, and that's because of bodily functions like bowel movements, urination, and wiping that has the tendency to degrade the sample. However, Mr. Saxon had stated that the sex occurred two days prior to her disappearance. If we take for a hypothetical example that O.W. was killed on, let's say, the 28th of March. Yeah, I mean, sort of sometime between midnight and whenever they would have woken her up for school, maybe 7 in the morning. So let's say the 28th. When she dies, the bodily functions that would degrade the sperm sample and DNA sample, bowel movements and urination and wiping, cease. She's not having bowel movements or wiping, etc. So those things that would degrade the sample and making the likelihood of obtaining a sample two days after that very likely, even though... Two or three days? Well, it was the 30th when they obtained the sample. In my hypothetical, she died on the 28th. So my point is that it is consistent with Mr. Saxon's statement that he had sex with her two days before. And you have to get almost five days out for the biological material still to be there. That's right. That's right. But pursuant to Mr. Gandora's testimony, that would be possible because of the bodily functions, the ceasing of the bodily functions. But not likely. Well, I think... He testified it's more likely that this was, the sexual assault was contemporaneous with or just immediately preceded the murder. That's what the state... Based on these bodily functions. Sure. Well, it's more likely to obtain the sample within 72 hours because of the bodily functions. Right. So it's less likely that a scenario, a defense scenario would obtain, basically. And far less likely because of the passage of time. I don't think so, Your Honor. I think that if, you know, using my hypothetical on the 28th... I would like to use the actual facts. Sure. Okay. And what his actual testimony was, is that it was very likely that she was sexually assaulted and then murdered right after the sexual assault based on the fact that this DNA was recoverable. If the sexual assault had occurred earlier, it was less likely that they would have recovered any DNA. Sure. But I would just point out that there isn't, we do not know at what point she died within that period. Right. It's a circumstantial case. Within the seven-hour period that I'm bracketing, sort of midnight to 7 a.m., we see her up until almost midnight. The brother goes in to wake her up for school, which I'm ballparking at 7 o'clock in the morning. And so there's a seven-hour period. And also, obviously, the food evidence, you know, we know what she had for dinner her last night. And even though these photographs, as you correctly point out, is one of your arguments, are pretty sad to look at. They do recover stomach content. So they know undigested, you know, if she'd been killed much later than that, it would have been digested. I agree, Your Honor. And one point, thing I would point out is that the testimony was that, you know, what she had actually had for dinner on the night that she disappeared was chicken, corn. And chicken and corn, all that was found in the stomach was corn. And there were beans found as well, which there is no testimony that she had eaten at that night. So it's unclear, at least to me, from the testimony, exactly at what point she was killed and why certain things were digested and certain things weren't digested. Certainly not part of the testimony in the case. So, Your Honors, I think it's important to look at what the state actually did prove in this case, which was our position is that the state only showed beyond a reasonable doubt that Mr. Saxon had sex with the victim. As for the crimes with which he was actually charged. But they do also show, I mean, this house seems to be Grand Central Station. I mean, there are all sorts of people in and around this house, some of whom live there, some of whom were over there for this gathering, party, whatever you want to call it, that night. But there is testimony that Mr. Saxon comes by a couple of times, even including later on. Yes, Your Honor. Do we get him that far? Yes, but our view is that, you know, that evidence of this opportunity evidence, right, that Mr. Saxon was in the same place that night. And also no forced entry. Apparently he's a regular occupant of the house, so he wouldn't need to force entry, I presume. Right. But our position is that the evidence is directly undercut by the fact that, as that night, there was no testimony that indicated any of them had left, although it was uncontroverted that Mr. Saxon had left. They were all excluded by DNA, weren't they? The male suspects were excluded? Alternative suspects? There were several, numerous, that were excluded by DNA, Your Honor. We're not clear on the testimony exactly how many people were in that house. It was essentially a party, as You can save for rebuttal if you'd like. Okay, thank you, Your Honor. All right, sure. And you can finish your thought then. Ms. Stotz. May it please the Court, Counsel, Maritha Stotz from the Attorney General's Office for the Respondent. If I could, I would like to start by briefly addressing the jurisdictional question. You can if you want to, but I have to say that our fellow circuits have read Rule 4 as a rule that has one part that deals with the timing of when an inmate has actually filed something, and another rule which discusses the location that the thing is supposed to go to. A lot of people, not just pro se people, not just prisoners, make the mistake of thinking that you file a notice of appeal in the court to which you are appealing instead of the court from which you are appealing. And the rule is very clear that the clerk of the Seventh Circuit, or the clerk of any of the courts of appeals, file stamps it in. That's the date that's used in the ordinary case unless the timing rule changes things. And that, it just gets routinely transferred back to the district court for logging in, and then the record gets properly transmitted. So I don't see anything wrong at all with applying the particular timing rules that apply. Everybody knows when the prisoner complaints arrive. They arrive typically later than the date when they should have arrived whenever you wind up needing to use the timing rule. So I just don't think this is something that's at all consistent with the philosophy of the timing rule, with the way we treat pro se's, and with the most logical reading of the rules. Well, if I could just briefly explain our position. The position is that interpreting 4C to not require the inmate to direct his notice to the district court would lead to absurd results. But it doesn't, because your argument, let me just pull up Rule 4C here, your argument ignores the fact that under D, it says mistaken filing in the court of appeals. This is not something, you know, where you send your notice of appeal to your best friend, or to your uncle, or to anybody else. This applies only if you send something to the court of appeals itself. So it narrows the universe of mistaken places to the only one that matters, which is the court of appeals. And only then, the court notes on the notice, the date when it's received, sends it to the district court, and then the district court will look at that and apply, if applicable, Rule 4C. What's wrong with that? Well, that's what happened here. I understand petitioner to be saying 4C applies regardless of where the inmate sends the notice. No, 4C applies only if you can use 4D, then 4C may save you. But I don't think anybody is saying, this is not a case, at a minimum, in which he decides to send the notice of appeal to his mother. You know, this is a case where the notice of appeal, which again, you have no idea how often this mistake is made. It's one of the common ones. It's only if it goes to the court of appeals, the court of appeals duly transmits it to the district court, and the district court then says, is this a timely notice of appeal? Oh, it's a prisoner. Let's see when the person put it in the prison system. If I understand that right, you're saying that 4C applies if the inmate sends it to the district court or to the court of appeals, but not anywhere else. Well, because 4D applies only to the court of appeals. There's no part of the rule that would benefit of a mistaken filing any place but the court of appeals. It's a specific rule to a mistaken filing in the court of appeals, which then directs the notice of appeal back to the district court, and the district court accepts it as if it had shown up in the district court that day. But in the case of prisoners, the district court realizes, oh, it showed up here this day, but this is a prisoner. Let's see when it Well, if I could just briefly, there's a possibility an inmate could send it somewhere else. And they wouldn't get the benefit of 4D then? No. Then it would just be late. You can spend your time arguing something that doesn't need arguing. I would get, if I were you, to the fact of the problem of the case itself. Certainly. There was more than enough evidence to show that this petitioner is a person who DNA evidence is not significant just because it gives him a motive to kill the victim, although it does, it also puts him at the scene of the murder because the murder occurred during or after the sexual assault. We know because the victim was found with her clothing off. So it's not just motive, it's timing. It puts him at the scene. We've also got the false exculpatory statement regarding Marvin Landfair. That's significant in two ways. It shows consciousness of guilt. He's trying to pin it on Landfair after he knows that his DNA is found inside the victim. And it's also the content of the statement. The statement shows that he knows the time of death and the manner of death, and he knows it because he's the killer. He says, oh, I know it was Landfair. He has blood on his coat. Well, no one had told him the victim had been stabbed. It's true the police had asked whether he carried a knife or whether he knew the victim to carry a knife, but they didn't say anything about how she died. Was that not publicly known? It's not as far as we know from the record. And in fact, in the first interview with the victim had been burnt up in a fire. So if that's all he knew, he would have thought she died in the fire. So there were no news reports of this? Not as far as we know from the record. Okay. So he knew the manner of death because he killed her, and he also made a statement about Landfair in reference to the time of death. He said, I saw him four days after she died. No one knew when the victim died. We knew she went missing on the evening of the 27th. Her body was found on the 30th. He knew when she died because he killed her. So the statement about Landfair is significant. It's a false exculpatory, and it shows knowledge of the circumstances of the murder. In addition to that, we've got access to the house. He lived there. He had a bedroom near the victim. He was familiar with the garage. He visited that property frequently when his aunt lives there. The garage is on a direct route between the house at 156 Wildwood and the residence at 1236 Maple, where he told the police he left when he left the house that night. We have a lot of inappropriate comments about the victim developing earlier, and people were interested in her, and he loved her, and this behavior of dragging the victim into a locked room and wrestling with her. He's 25. She's 12. So all of that evidence is more than sufficient for the jury to find that Petitioner is the person who committed these crimes, and certainly it wouldn't be unreasonable for the state court to conclude that was the case. Just a couple of quick points about some of the things Petitioner mentioned. I think he's over-interpreting the DNA expert's testimony about how the DNA would have degraded. One of the things the expert mentions was conditions. This DNA was in the rectal canal. There's no reason to think it wouldn't degrade just as rapidly if the victim was deceased. It wouldn't depend solely on habits of an alive victim dissipating the DNA, or at least a reasonable jury could conclude that was the case. It's surprising there's no evidence, though. You would think this would be known in the forensic medical community. How quickly does sperm degenerate so that you can't get a decent DNA sample? How quickly does blood break down and become difficult? There are different kinds of tissue that are tested. It seems to me there must be some literature on that. Perhaps. The testimony was a bit vague, though. It was, as Petitioner characterized, that after 72 hours. This was in the mid-1990s when forensic DNA evidence was just emerging. True. He wasn't himself tested until five years later. That's right. As I understand it. He had been a suspect all along, but there was a five-year gap before he ultimately was tested and the match was declared. But at the time, the sophistication level wasn't the same as it is now. I would assume that to be true, right. I know Petitioner also mentioned numerous other individuals. There were a lot of people in the house. Seven other people were excluded as a source of the DNA that Petitioner had. Most of these people gave blood samples pretty quickly. Most people gave them voluntarily. There's no evidence anyone else was sexually assaulted. He was in prison for something else and then they got a warrant. That's right. He was in prison for sexual assault of another child when the warrant was executed in 2000. Just one other point. Petitioner mentioned he wasn't charged with sexual assault. That's not exactly the full story. He was charged with sexual assault as the predicate felony for felony murder. It wasn't a standalone charge, but it was certainly part of the charge, part of the proof. Well, unless the court has any questions, we'd ask the court to dismiss for lack of jurisdiction or in the alternative, affirm the judgment. All right. Thank you. Mr. Miller. Thank you, Your Honor. Just a couple of brief points. On the Marvin Landfair issue and what Ms. Stott said about Mr. Saxon knowing details about the crime that he couldn't have known, it's reasonable for Mr. Saxon being interviewed and asked about a knife being involved in this killing to presume that there was blood that came out of the victim. So for him to say that he saw Marvin Landfair with blood on his jacket, I don't think that suggests, in light of what the interviewing police officer was asking him about... But a jury could reasonably conclude otherwise. Come again? I'm sorry. A jury could reasonably conclude otherwise. Well, you know, Your Honor, I think perhaps a jury could. But what we're saying is that it's not out of hand indicative of Mr. Saxon's knowledge of these specific facts beforehand. On the opportunity evidence, I just wanted to finish off my thought. Sure. Please. There were numerous individuals in that house, although some of them had been tested and excluded as contributors to the DNA. We don't know how many were in that house. Well, it's none of the women, right? And so it's only the men. Yes. And I thought they basically got ruled out. Who wasn't ruled out? Well, my point is that there's no telling exactly who was in that house. There was no definitive cataloging of the number of people that were in the house or how many people were in the house that night. Because the testimony was that it was basically a party, it indicates that there could be numerous others. But the last point is really that all of those people were alleged to be intoxicated and drinking, taking drugs. None of them, there's no evidence that any of them left. There is evidence that Mr. Saxon left. We think that that means it's more likely that any one of those individuals that were left in the house and intoxicated that night could have seized on this alleged opportunity to perform these crimes. Thank you. All right. Thank you very much. And we appointed you, I believe. Thank you very much for your service to the court and your client. Thanks. Thanks as well to the state.